IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DIANA G. KERWIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | CIV-05-1202-M |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of

Defendant Commissioner denying her application for disability insurance benefits under Title

II of the Social Security Act, 42 U.S.C. §§ 416(i), 423.   Defendant has answered the

Complaint and filed the administrative record (hereinafter TR___).  Both parties have briefed

the issues, and the matter has been referred to the undersigned Magistrate Judge for initial

proceedings consistent with 28 U.S.C. § 636(b)(1)(B).   For the following reasons, it is

recommended that the Commissioner's decision be affirmed.

I. Background

Plaintiff filed her application for benefits on June 28, 2002, alleging she became

disabled on January 15, 2000, due to "thyroid, esophagus, breathing problems, foot[,] back,

1

arm, hand, hyperthyroidism, stomach, depression, memory loss, [and] panic attacks." (TR 54-57). Plaintiff described previous work as a fast food restaurant manager, cashier, paper route carrier, dry cleaner clerk, receptionist/secretary, and filing clerk. (TR 75, 87-94). In a questionnaire addressing Plaintiff's complaint of pain, Plaintiff described constant pain in her lower back, both legs, right arm, and right hand. (TR 96-98). She stated the pain began eight years previously and had "just gotten worse and worse." (TR 96). Plaintiff stated she used a cane for balance, that she could not squat, bend, or stoop, and that she took medication for arthritis which did not resolve the pain. (TR 96, 98). Plaintiff's application was denied on initial consideration by the agency. (TR 21). With her request for reconsideration of the administrative decision, Plaintiff stated that she had been diagnosed with the hepatitis C virus, that she "cannot set [sic], stand, or walk (without the use of a cane) for long period[s] of time," that she "can't hardly use [her] right hand," and that she also suffers from bowel incontinence, severe depression, reflux disease, decreased vision, anxiety and stress, memory loss, carpal tunnel in her right hand, arthritis "in all ... joints," and bipolar disorder. (TR 101). Plaintiff's application was administratively denied. (TR 22).

At Plaintiff's request, a hearing *de novo* was conducted before Administrative Law Judge Hiltbrand ("ALJ") on January 21, 2004, at which Plaintiff and a vocational expert ("VE") testified. (TR 361-393). Following the hearing, the ALJ issued a decision (TR 11-18) in which the ALJ found that Plaintiff was insured for disability insurance benefits through September 30, 2002, and that Plaintiff had severe impairments due to chronic obstructive pulmonary disease ("COPD"), degenerative disc disease, hypothyroidism, and hypertension.

(TR 14).  Despite these impairments, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform work at the light exertional level.  Relying on the VE's testimony regarding the vocational characteristics of Plaintiff's past relevant work, the ALJ found that Plaintiff's RFC did not prevent her from performing her previous jobs as a dry cleaner clerk, fast food manager, receptionist, filing clerk, paper route carrier, and cashier as those jobs were performed by the Plaintiff. (TR 16).  Based on these findings, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (TR 17-18).  The agency's Appeals Council denied Plaintiff's request to review the administrative decision (TR 4-6), and Plaintiff now seeks judicial review of the final decision of the Commissioner embodied in the ALJ's determination.

II. Standard of Review

Judicial review of this Complaint is limited to determining whether the Commissioner's decision is based upon substantial evidence and whether the correct legal standards were applied.  Emory v. Sullivan, 936 F.2d 1092, 1093 (10th Cir. 1991).  The court will look to the record as a whole to determine whether the evidence which supports the Commissioner's decision is substantial in light of any contradicting evidence.  Nieto v. Heckler, 750 F.2d 59, 61 (10th Cir. 1984); Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir. 1983)(per curiam).  If the Commissioner fails to apply the correct legal standard or substantial evidence does not support the Commissioner's decision, the court may reverse the Commissioner's findings. Byron v. Heckler, 742 F.2d 1232, 1235 (10th Cir. 1984)(per curiam).  The court may not reweigh the evidence or substitute its judgment for that of the

Commissioner.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1498 (10th Cir. 1992). To find that the Commissioner's decision is supported by substantial evidence in the record, there must be sufficient relevant evidence in the record that a reasonable person might deem adequate to support the ultimate conclusion.  Bernal v. Bowen, 851 F.2d 297, 299 (10th Cir. 1988).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §416(i). The Commissioner applies a five-step inquiry to determine whether a claimant is disabled.  See 20 C.F.R. §404.1520(b)-(f) (2006); see also Williams v. Bowen, 844 F.2d 748, 750-752 (10th Cir. 1988)(describing five steps in detail).  The claimant bears the initial burden of proving that she has one or more severe impairments.  20 C.F.R. §404.1512 (2006); Turner v. Heckler, 754 F.2d 326, 328 (10th Cir. 1985).  Where the plaintiff makes a *prima facie* showing that she can no longer engage in prior work activity, the burden of proof shifts to the Commissioner to show "the claimant retains the capacity to perform an alternative work activity and that this specific type of job exists in the national economy." Turner v. Heckler, 754 F.2d at 328; Channel v. Heckler, 747 F.2d 577, 579 (10th Cir. 1984).

Plaintiff's insured status for Title II disability insurance benefits expired on September 30, 2002. (TR 253, 360).  Consequently, to be entitled to receive disability insurance benefits, Plaintiff must show that she was "actually disabled [within the meaning of the

Social Security Act] prior to the expiration of [her] insured status" on September 30, 2002.

Potter v. Secretary of Health & Human Servs., 905 F.2d 1346, 1349 (10th Cir. 1990)(*per*

*curiam*); accord, Adams v. Chater, 93 F.2d 712, 714 (10th Cir. 1996); Henrie v. United States

Dep't of Health & Human Servs., 13 F.3d 359, 360 (10th Cir. 1993). "[T]he issue is the

existence of a disability at a particular time and not the identification of a cause." Flint v.

Sullivan, 951 F.2d 264, 268 (10th Cir. 1991). In other words, if there is medical evidence

of a degenerative or ongoing impairment, "[t]he relevant inquiry ... is whether the claimant

was actually disabled during the relevant time, not whether a disease existed that ultimately

progressed to a disabling condition." Stonebraker v. Shalala, 827 F.Supp. 1531, 1536

(D.Kan. 1993). In this case, the evidence relevant to Plaintiff's claim relates to her

impairment(s) after the alleged onset date and before the expiration of her insured status.

III. Medical Evidence

Plaintiff stated in her application that a myriad of vague conditions rendered her

unable to work. (See TR 54, 74, 81). At her administrative hearing, Plaintiff was not any

more specific concerning the origin and history of her allegedly disabling impairments.

Plaintiff testified that she "started getting sick and ... gained some more medical things..."

which caused her to quit working as a dry cleaner clerk. (TR 371-372). When questioned

further about this vague description, Plaintiff stated only that she had "thyroid problems and

stuff like that that bottoms out on me....I started getting stomach problems where I couldn't

eat, and drink water, and things like that." (TR 372). When questioned about her allegation

that back problems caused her disability, Plaintiff stated that her back "hurts all the time" and

that her back was injured in a work-related accident in which she picked up some heavy cases of milk "around '90 [or] '91 [or s]omething like that." (TR 373). The only medical treatment she could describe for this injury at the time it occurred was "intense therapies and stuff like that" and she stated that she just took "pills" for her back problems at the time of the hearing. (TR 373-374).

When asked about her allegation of an impairment to her knees and feet, Plaintiff could only vaguely state that she "hurt [her] feet, [her] right foot...[and she] can't hardly walk at times." (TR 374). She related this to an undefined right ankle injury occurring "[i]n the '90s, 1992 or something." (TR 385). When questioned about her allegation of an impairment to her right arm and hand and neck, Plaintiff responded only "[p]ain and migraines." (TR 375). She stated that she was diagnosed with ulcers "[a] long time ago...[c]ouldn't even tell you." (TR 375). She stated she is not able to "control [her] bowels" but when questioned about when this condition began, Plaintiff stated that this only began "last year" in 2003. (TR 376). Plaintiff denied any mental health counseling and could only describe being "frustrated" with her children and grandchildren because "[t]hey're loud and a bunch of people at the same time." (TR 376). She stated she takes undescribed "medicine for worrying" and she takes "all kinds of medicine." (TR 377). Plaintiff testified she had undergone gallbladder removal and thyroidectomy operations (TR 377) and that she had sought emergency room treatment when her "blood pressure got real high" and her face turned red, but that the physicians had not found any problems with her heart or chest at that time. (TR 378). She stated she has "panic attacks" beginning at an unidentified time in 2002

6

but she could not describe what brings them on. (TR 379-380).  She stated she is depressed "because I don't have my life." (TR 386).  Plaintiff also testified she has a "reflux problem" for which she takes medication. (TR 387).

The medical record shows that Plaintiff underwent gallbladder removal surgery in March 1999, and that her recovery was uneventful.  One week following the operation her surgeon allowed her to resume her normal activities. (TR 111).  Plaintiff's medical care during 1999 was provided by a physician's assistant with Dr. Nagode. (TR 118, 127-154).  These records show that in February 1999 and again in May 1999 Plaintiff complained of anxiety and stress related to family issues, including a father with Alzheimer's disease who lived with Plaintiff. (TR 137, 152, 154).  Plaintiff was diagnosed in August 1999 with estrogen deficiency, hypothyroidism, and COPD. (TR 131).    At that time, a physical examination reportedly reflected that Plaintiff's gait was normal and she had "excellent range of motion" of her cervical, thoracic, and lumbar spines, and in her knees, elbows and hands "with no crepitance, tenderness or loss of strength" and good muscle tone with no neurological or sensory deficits. (TR 131). Pulmonary function studies showed "borderline" COPD but no active lung disease, and the examiner noted Plaintiff was a "long time smoker." (TR 131).  Later in August 1999, Plaintiff was diagnosed with the hepatitis C virus. (TR 129).  An ultrasound of her liver revealed no hepatic abnormality as interpreted by the radiologist. (TR 127).  A consultative examiner, Dr. Northey, saw Plaintiff in September 1999 and noted in his report that Plaintiff's liver function tests were normal, that she had a history of a blood transfusion and drug abuse, and that she showed no evidence of active

chronic hepatitis C. (TR 122-123).   Although Dr. Northey recommended that Plaintiff undergo a hepatobiliary scan and undergo liver function tests on a periodic basis, there is no indication that Plaintiff followed this recommendation or sought further treatment from Dr. Northey. (TR 123).

Although Plaintiff alleged that she became unable to work in January 2000, there are no records of medical treatment of Plaintiff from October 1999 through September 2000. Plaintiff sought treatment at University Hospital in October 2000 for a three week history of right foot pain with no known injury. (TR 186).  Plaintiff stated that the only medications she was taking were hormone replacement and thyroid replacement medications. (TR 185, 186). A physical examination at that time was reportedly normal. (TR 181, 184).  An x-ray of Plaintiff's right foot showed no fracture or dislocation and some cystic changes and asymmetric changes consistent with degenerative osteoarthritis in Plaintiff's first toe. (TR 177, 188).  Conservative treatment was recommended for her foot pain. (TR 185).

Plaintiff sought treatment at University Hospital in November 2000 for thyroid problems and a "knot" and swelling in her right foot. (TR 174, 178).  The examining physician noted Plaintiff gave a history of hepatitis C virus diagnosis in 1990, thyroid replacement therapy status post thyroidectomy in 1995, gallbladder removal surgery in 1999, gastrointestinal reflux disease ("GERD"), difficulty swallowing (dysphagia) since her thyroidectomy, hormone replacement therapy status post hysterectomy in 1990, an ulcer in 1995, a "crush injury" to her right foot in 1990, intravenous drug abuse twenty years previously, three pack per day smoker for thirty years, and right foot swelling after excessive

standing. (TR 178, 344).    The attending physician noted Plaintiff stated she was the "caregiver for grandchildren during daytime" and for her "ill father at night." (TR 345). Plaintiff was prescribed anti-inflammatory medication, hormone replacement therapy medication, and medication for GERD. (TR 178).

On December 20, 2000, Plaintiff was seen at University Hospital's gastrointestinal/endoscopy unit for her complaint of progressive heartburn.  (TR 171). Plaintiff underwent an upper gastrointestinal endoscopy, and the diagnosis of the treating physicians, Dr. Harty and Dr. Saymeh, was grade II reflux esophagitis, Mallory-Weiss tear, Schatzki ring, hiatus hernia, and normal stomach and duodenum.  (TR 167-168).  Plaintiff was prescribed medication and advised in anti-reflux measures, including weight loss and avoiding cigarettes. (TR 168).   In January 2001, Plaintiff underwent a second upper gastrointestinal endoscopy, which showed the Mallory-Weiss tear in her esophagus had healed.  During this procedure, Doctors Parikh and Guild noted that the Schatzki ring in Plaintiff's esophagus was successfully dilated and that there was no evidence of significant pathology in Plaintiff's stomach. (TR 160-161).

There are no notes of intervening medical treatment of Plaintiff  until August 2001, when Plaintiff sought treatment at a family physicians clinic.  Despite her complaints of coughing, shortness of breath, and urinary incontinence with coughing, Plaintiff reported she continued to smoke three packs of cigarettes per day. (TR 193).  A breathing treatment was provided to Plaintiff, and Plaintiff was treated for bronchitis with medications. (TR 193).

The record shows another extended period in which Plaintiff did not seek medical

treatment for twelve months from August 2001 until July 2002.  In July 2002, Plaintiff sought treatment at a medical clinic where she complained of breathing problems, reflux, constant cough, and thyroid deficiency. She indicated she had stopped using antacid and respiratory inhalant medications two months previously and was not taking thyroid replacement medication. (TR 334).  Plaintiff also complained of "multiple joint pains," including right wrist, right foot, and lower back pain, that she stated were previously helped with anti-inflammatory medication. (TR 334). A chest x-ray was normal. (TR 340).  Plaintiff was prescribed anti-gastric, respiratory inhalant, thyroid replacement, and anti-inflammatory medications. (TR 336).  The treating physician noted that Plaintiff's shortness of breath was probably a combination of GERD and COPD. (TR 336).  The treating physician noted that Plaintiff showed no signs of depression but prescribed an anti-depressant medication (TR 336).

In August 2002, Plaintiff sought treatment at an emergency room for complaints of chest pain occurring off and on for approximately six months, increased by stress and anxiety and relieved with rest.  (TR 201).  Plaintiff denied urinary or bowel problems and gave a history of anxiety and smoking. (TR 201).  On physical examination, the attending physician noted that Plaintiff's lungs were clear, she exhibited normal gait, normal heel and toe walking, no edema, no tenderness, good pulses, regular heart rate and rhythm, and no neurological, motor, or sensory deficits. (TR 202).  The diagnosis was "atypical" chest pain, anxiety, and hypertension. (TR 202).  Her cardiac enzyme testing was normal, and Plaintiff was discharged with a diagnosis of non-cardiac chest pain. (TR 203).  Plaintiff underwent

10

a stress echocardiogram in August 2002 which was interpreted as normal. (TR 312).

In August 2002, Plaintiff also sought emergency room treatment for right ankle pain, swelling, and right foot pain, which was diagnosed as an acute sprain and treated conservatively. (TR 317-318).   A physical examination conducted at that time by the attending physician showed Plaintiff was alert and in no acute distress, her right knee was stable and nontender, and her right ankle was swollen and slightly tender. (TR 317).   An x-ray of her right ankle and right foot showed only mild degenerative changes of several end joints of her toes and no other abnormality. (TR 322).   The ankle was wrapped, and Plaintiff was advised to rent crutches and to elevate and ice the ankle to conservatively treat the sprain.  (TR 318).

Plaintiff returned to her treating clinic in August 2002 for follow-up examination. Plaintiff complained of right wrist pain, diagnosed as osteoarthritis, for which anti-inflammatory medication was prescribed. (TR 327).   Medication was also prescribed for Plaintiff for hypertension. (TR 327).   Plaintiff was advised to stop smoking to improve her COPD.  The treating physician noted that Plaintiff's extremities showed no swelling. (TR 327).

Plaintiff again complained of right wrist pain to her treating clinic physician in September 2002, although she reportedly stated that the anti-inflammatory medication helped her pain. (TR 310).   The physician noted Plaintiff was advised to continue the anti-inflammatory medication, referred for nerve conduction studies, and advised to obtain a wrist splint. (TR 310).  With respect to her right upper extremity, the physician noted that Plaintiff

exhibited no sensory deficit and negative Tinnel's sign. The physician noted that Plaintiff's gastritis was being controlled with medication, that her COPD was stable on medication, and that her hypertension was under better control with medication. (TR 310).

In December 2002, Plaintiff returned to the treating clinic for a follow-up evaluation, where she complained of a chronic cough and stated she had not obtained the nerve conduction studies of her right upper extremity as previously ordered.  (TR 305).  The attending physician noted Plaintiff's hypertension was in good control on medication, that she was advised to continue her current regimen for COPD, that anti-anxiety medication was prescribed based on her complaint that "her life is falling apart," and that Plaintiff was again referred to the neurology clinic, although her right wrist range of motion was noted to be normal. (TR 305).  There is no reported complaint of wrist pain at a subsequent follow-up visit by Plaintiff to her treating clinic in April 2003. (TR 302).  No nerve conduction studies or x-rays related to Plaintiff's right upper extremity appear in the record.

In September 2002, Plaintiff underwent a consultative physical examination for the agency conducted by Dr. Cates. During this examination, Plaintiff complained of right arm and hand pain and inability to use her right hand due to "carpal tunnel" in her right wrist, low back pain which was constant, radiating to her legs, and increased with doing "almost anything," and for which she used a cane to walk for "balance problems," right foot pain due to an old crush injury to her toes and which was "excruciating" with walking, breathing problems caused by emphysema for which she was using inhalers, reflux and ulcers for which she took medication, problems with indigestion, nausea, and vomiting, and chest pain.

(TR 236-237).

In Dr. Cates' report of this examination, Dr. Cates noted that Plaintiff was "playing up" her limitations during his physical examination. (TR 238). Despite this statement recognizing Plaintiff's exaggeration of her limitations, Dr. Cates noted his diagnostic impression of right arm and hand pain due to carpal tunnel syndrome, low back pain, right foot pain, ankle pain, and an unstable gait. (TR 240). Dr. Cates also noted that Plaintiff "does appear to be significantly limited in her ability to function on a daily basis." (TR 240).

In October 2002, Plaintiff underwent a consultative mental status evaluation conducted by Dr. Edgar. Dr. Edgar's report of this evaluation reflects that Plaintiff was unable to recall how many grandchildren she had or when she was last in the hospital, she did not know her name, address, or telephone number, was not sure if she had high blood pressure or whether she took medicine for that, and she could not recall when or where she hurt her back, although she used a cane for walking and appeared slow and unsteady on her feet. (TR 248). When asked if she felt sad or depressed, Plaintiff reportedly responded, "Not allowed." (TR 248). She reportedly stated that she did not get along with her family members and she heard voices that others did not hear "All time." (TR 248-249). When asked who the voices were, she reportedly responded "No, woman saying IDK, Devil talks to me and Lord saves me. Bad thoughts. I can't say nothin [sic]. Mother hates me." (TR 249). She reportedly stated she was there to "see another doctor" and did not know who Dr. Edgar was, and she made very little eye contact with the physician. (TR 249). Other responses were similarly vague and unrelated to the questions posed by the physician. (TR

13

248-250).   Dr. Edgar's diagnostic impression was "likely...bipolar vs. schizoaffective disorder with severe major depression now and some [audio and visual] hallucinations.  She may have some [post-traumatic stress syndrome] related to her childhood abuse." (TR 250). Dr. Edgar also noted that Plaintiff "likely has an underlying personality disorder and may have learning disabilities" and a "current" global assessment of functioning ("GAF") score of 30 to 40. (TR 250-251).

Plaintiff also underwent a consultative  pulmonary function study in October 2002 conducted by Dr. Dougherty, and the consultative examiner noted that Plaintiff's cooperation with the study was "poor." (TR 253-254).  X-rays of Plaintiff's lumbar spine and right ankle conducted in October 2002 were interpreted as showing minimal degenerative changes in the lumbar spine and no abnormalities in the right ankle. (TR 259).

Because of Plaintiff's complaint of chronic pain in her low back and pain and swelling in her right lower extremity at a follow-up examination at her treating clinic in April 2003, Plaintiff was referred to a pain clinic.  (TR 302).  Plaintiff was evaluated by Dr. Alhaj at a pain management clinic in April 2003, where she gave a "long history of multiple injuries over the years starting in 1983...[and] continued pain all these years [which] increases with prolonged time sitting, standing, and lying down in her home [and] decreases with rest and pain pills." (TR 286).  Plaintiff reportedly described numbness in both hands, her right foot, and lower leg, bilateral weakness in her arms and legs due to pain, bladder incontinence for one year, and bowel incontinence. (TR 286).  Plaintiff stated she spent up to 10 hours per day in bed or reclining due to pain and suffered depression associated with her pain. (TR 286).

14

Dr. Alhaj noted Plaintiff appeared to be adequately nourished, in no acute distress, alert and oriented to person, place, and time, pleasant and cooperative, and she exhibited an appropriate affect and "exaggerated pain behaviors." (TR 287).  Plaintiff walked with a normal gait using a cane and exhibited normal lumbar range of motion, normal joints, intact coordination in upper and lower extremities, no sensory or neurological deficits, and normal strength in her upper and lower extremities. (TR 287).

## IV. Consultative Examinations

In his decision, the ALJ evaluated the evidence following the requisite sequential evaluation procedure.  Plaintiff alleges that the ALJ erred at the fourth step of the evaluation procedure in determining Plaintiff's RFC for work.  At this step, the ALJ found that Plaintiff has the RFC to perform work at the light exertional level.  First, Plaintiff contends that the ALJ  ignored relevant evidence in the reports of the consultative examiners, Dr. Cates and Dr. Edgar, and failed to provide sufficient explanation for his rejection of the findings of these consultative examiners.   Secondly, Plaintiff contends that the ALJ's credibility determination is not supported by substantial evidence in the record.

Under 20 C.F.R. § 404.1527(d)(2006), the ALJ is required to evaluate every medical opinion in the record.  Medical opinions from a treating source are evaluated under special rules set forth in 20 C.F.R. § 404.1527(d)(2) to determine whether the treating source's opinion is entitled to controlling weight.  When considering the report of a consultative examiner obtained by the agency, the ALJ is required to consider certain factors, including the consistency of the report with other information in the record. 20 C.F.R. § 404.1519p

(2006).  If any of the evidence in the record is inconsistent with other evidence, or is internally inconsistent, the ALJ must weigh all of the evidence. 20 C.F.R. § 404.1527(c)(2) (2006).  Inconsistencies in the evidence are resolved by the ALJ based on the evidence in the record. 20 C.F.R. § 404.1527(c)(4) (2006).  "The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996)(internal citation omitted).

To find that a claimant's pain is disabling, the "pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." Brown v. Bowen, 801 F.2d 361, 362-363 (10th Cir. 1986)(internal quotation omitted). "Subjective complaints of pain must be evaluated in light of plaintiff's credibility and the medical evidence." Ellison v. Secretary of Health & Human Servs., 929 F.2d 534, 537 (10th Cir. 1990).

In assessing the credibility of a subjective allegation of disabling pain, the ALJ must consider such factors as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with

16

objective medical evidence.

Hargis v. Sullivan, 945 F.2d 1482, 1489 (10th Cir. 1991); see Luna v. Bowen, 834 F.2d 161, 165-166 (10th Cir. 1987).   Credibility determinations that are "closely and affirmatively linked to," and supported by, substantial evidence in the record are entitled to deference. Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005)(quotation omitted).

It is obvious from a review of the ALJ's decision that the ALJ considered the reports of the consultative examiners, Dr. Cates and Dr. Edgar.  The ALJ summarized the findings in Dr. Cates' report of his consultative examination of Plaintiff with regard to her subjective statements and the physician's diagnostic impressions. (TR 13).  The ALJ summarized the diagnostic impressions of Dr. Edgar as well. (TR 13-14).  Plaintiff contends that the ALJ failed to discuss Dr. Cates' examination findings with  respect to Plaintiff's functional abilities in her lower back, neck, hips, right knee, right ankle, shoulder, left wrist, right thumb, and right hand, and Dr. Cates' observations with respect to Plaintiff's ability to walk and her overall ability to function.  The ALJ was not required to discuss every aspect of Dr. Cates' report of his consultative examination of Plaintiff.   In Dr. Cates' report of his consultative examination of Plaintiff, the physician recognized Plaintiff was exaggerating her functional limitations.   The ALJ discounted the credibility of Plaintiff's allegation of disabling pain and functional limitations in part due to Dr. Cates' own recognition of her hyperbole. (TR 15).  In light of Dr. Cates' statement, the findings in his report of Plaintiff's specific functional limitations and overall ability to function were not probative of Plaintiff's

actual functional ability.  The ALJ provided numerous reasons, which are well supported by the evidence, for discounting the credibility of Plaintiff's allegations of disabling pain and functional limitations. (TR 15).  Plaintiff's argument that the ALJ should have considered Dr. Cates' specific findings with respect to Plaintiff's functional ability, despite Dr. Cates' statement that Plaintiff was exaggerating her functional limitations and despite  numerous inconsistencies between her allegations and the objective medical evidence, is disingenuous.

Although Plaintiff contends that the ALJ ignored Plaintiff's "need for an assistive device," there is nothing in the record showing that a physician has recommended the long-term use of any assistive device for walking.  The ALJ noted that the record was inconsistent with Plaintiff's allegation that she had difficulty walking due to low back, right foot, and right ankle pain.  Specifically, the ALJ noted that in August 2002 an examining physician found Plaintiff to have a normal gait, the ability to heel and toe walk, and no motor, sensory, or focal deficits. (TR 15).  An examining physician recommended that Plaintiff "rent some crutches" as part of a short term of conservative treatment in August 2002 for a right ankle sprain. (TR 318).  However, nothing in the record supports Plaintiff's assertion that she needed a cane or other assistive device for persistent use during the relevant period.  The fact that Plaintiff was noted by examining physicians to be using a cane is not objective medical evidence of the need for an assistive device for walking.

Plaintiff also posits that the ALJ erred in failing to include any handling or fingering limitations in the RFC finding.  Plaintiff again relies on Dr. Cates' report of his consultative examination of Plaintiff.  Plaintiff insists that Dr. Cates' findings of limited functional

18

abilities in Plaintiff's hands and wrists were consistent with other medical evidence in the record.  Plaintiff points to two instances in which treating physicians noted Plaintiff complained of wrist pain in August and September 2002.  However, the record of the September 2002 visit to Plaintiff's treating clinic shows that Plaintiff was treated conservatively with anti-inflammatory medication  and advised to obtain a wrist splint and to undergo nerve conduction studies in the neurology clinic.  (TR 307, 310).  The examining physician noted the absence of a definitive diagnosis.  (TR 310).  No doctor has restricted Plaintiff's ability to use her hands or fingers. The ALJ's failure to include handling or fingering limitations in his RFC finding is supported by substantial evidence in the record.

With respect to the report of Dr. Edgar, the consultative mental status examiner, the ALJ noted that Plaintiff's "complaints at the mental status consultative exam were exaggerated, possibly in an attempt to generate evidence for her appeal.  Her limitations appear to be related to her physical condition, not due to a mental impairment." (TR 14).  The report of Dr. Edgar shows Plaintiff was irrational and non-responsive throughout the examination, although there is no other medical evidence in the record consistent with this obviously-exaggerated behavior.  As the ALJ reasoned, Plaintiff was prescribed anti-depressant medication and was treated one time during the relevant period for chest pain apparently related to anxiety, but that she had no history of mental health treatment. (TR 14).  The ALJ appropriately discounted both the credibility of Plaintiff's allegation of severe mental impairments and Dr. Edgar's findings of possibly severe mental impairments and related functional limitations because they were inconsistent with the remaining medical and

nonmedical evidence in the record.

Additionally, Plaintiff's assertion that the ALJ was required to evaluate the reports of the consultative examiners in the same manner as the opinions of a treating physician is wholly without merit.  The ALJ provided sufficient reasons, which are well supported by the record, for discounting the findings of the consultative examiners that Plaintiff has functional limitations precluding her from performing any work activity and the credibility of Plaintiff's complaints of severe and disabling pain and limitations.  No error occurred in this regard.

The ALJ relied on the VE's testimony regarding the exertional requirements of Plaintiff's previous job in finding that Plaintiff was capable of performing several previous jobs in light of her RFC for work.  The VE's testimony provided substantial evidence to support this finding.  Accordingly, the Commissioner's decision that Plaintiff is not disabled within the meaning of the Social Security Act should be affirmed.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's application for disability insurance benefits.  The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before ___October 11th___, 2006, in accordance with 28 U.S.C. §636 and LCvR 72.1.  The parties are further advised that failure to file a timely objection to this Report and Recommendation waives their respective right to appellate review of both factual and legal issues contained herein. Moore

v. United States, 950 F.2d 656 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the undersigned

Magistrate Judge in the captioned matter.

ENTERED this _____21st_____ day of ___September___, 2006.


GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE